BERG, Plaintiff in error, v. STATE, Defendant in error.

*No. State 40. Submitted under sec. (Rule) 251.54 March 6, 1974.—*
*Decided April 12, 1974.*
(Also reported in 216 N. W. 2d 521.)

The cause was submitted for the plaintiff in error on the briefs of *Howard B. Eisenberg,* state public defender, and for the defendant in error on the brief of *Robert W. Warren,* attorney general, and *Thomas J. Balistreri,* assistant attorney general.

HALLOWS, C. J. The dispositive issue on this appeal is whether LSD, as defined in sec. 161.30 (1) (a) 3, Stats. 1969, includes nonhallucinogenic isomers of LSD or is to be restricted to d-LSD, the only hallucinogenic isomer of LSD. Sec. 161.30 (2), Stats. 1969, provides "No person except a practitioner shall deliver any dangerous drug except upon the prescription of a practitioner." A dangerous drug is defined in sec. 161.30

(1) (a) 3, Stats. 1969, which was applicable at the time the alleged crime was committed, as meaning *inter alia:*

" 'Lysergic Acid,' 'LSD' (lysergic acid diethylamide), 'DMT' (N-N-Dimethyltryptamine), peyote, mescaline, psilocyn or psilocybin, or any salts, derivatives, compounds, combinations or mixtures thereof and any substances which are chemically identical with such substances."

Berg argues that only lysergic acid diethylamide in hallucinogenic form, d-LSD, is proscribed by sec. 161.30 (2), Stats. 1969, read in conjunction with sec. 161.30 (1) (a) 3, Stats. 1969; and because there was no proof submitted that he in fact sold d-LSD, his conviction must be reversed for failure to prove an essential element of the crime, namely, that what he sold was in fact a dangerous drug. The state maintains that all isomers of LSD are proscribed by these sections and not merely d-LSD, the hallucinogenic isomer.

The facts of the sale are not in dispute. On May 31, 1972, in an auto parked in front of a house on Van Buren Street in the city of Green Bay, Berg sold one Daniel G. Hughes, an undercover crime investigator for the state of Wisconsin's department of justice, division of criminal investigation, 25 tinfoil-wrapped packets of a substance he represented as mescaline for the price of $25. On June 8, 1972, Berg again sold Hughes 25 packets of a substance represented as mescaline in a house on Adams Street in Green Bay. These packets were analyzed at the state crime laboratory and found to be LSD.

At the trial both sides presented testimony on the chemical structure and the hallucinogenic effects of LSD and its isomers. It appears without dispute in the testimony that LSD (lysergic acid diethylamide) has four isomers, three of which are nonhallucinogenic and only d-LSD is hallucinogenic. In contrast to a derivative which substitutes an atom or a group of atoms for

another atom resulting in a different molecular formula, an isomer merely differs in structural arrangement of the same molecular formula. The four isomers are: (1) d-lysergic acid diethylamide; (2) l-lysergic acid diethylamide; (3) d-isolysergic acid diethylamide; and (4) l-isolysergic acid diethylamide. The structural distinction might be summarized as follows: The LSD molecule is made of four rings, the ergoline nucleus with a double bond between carbon atoms nine and 10. These four rings make a relatively flat structure. At carbon atoms five and eight, each carbon is bonded to one hydrogen. At each point, the hydrogen atom might either be above the molecular plane or below it. In d-iso-LSD, both hydrogens are in front of the rings; in its mirror image, l-iso-LSD, both hydrogens are in back of the rings. In d-LSD, the hydrogen at carbon atom five is forward and the hydrogen at carbon atom eight is behind, whereas in l-LSD, the converse is true. Only d-LSD (d-lysergic acid diethylamide) is hallucinogenic, *i.e.*, causes hallucinations. The prefix character "d" refers to the direction in which the isomer rotates a plane of polarized light. Testing by optical rodatory dispersion can distinguish d-lysergic acid diethylamide from l-lysergic acid diethylamide because light is dispersed in opposite directions.[1]

It was uncontroverted that infrared spectroscopic analysis could distinguish between lysergic acid and diethylamide and isolysergic acid diethylamide because of their

[1] *See generally:* Stoll & Hoffman, *The Ergot Alkaloids*, 8 The Alkaloids 729 (R. Manske ed. 1965); Kelleher, *Ergot Alkaloid Fermentations*, 11 Adv. Applied Microbiology 211 (1969); Sandoz Pharmacological Laboratories, *Pharmacologic Properties and Psychotogenic Effects of Some Lysergic Acid Derivatives;* Stein, Laessig and Indriksons, *An Evaluation of Drug Testing Procedures Used by Forensic Laboratories and the Qualifications of Their Analysts*, 1973 Wisconsin Law Review 727, 776, 771, n. 176; Bailey and Rothblatt, *Handling Narcotic & Drug Cases* (1972), pp. 268, 269, sec. 330.

different inherent physical and chemical properties. Since the infrared spectroscopic analysis conducted in the instant case produced a positive result and thus eliminated isolysergic acid diethylamide, it was concluded that the substance sold was either d (dextro)-lysergic acid diethylamide or l (levo)-lysergic acid diethylamide. However, it was admitted this test did not determine which of these isomers the substance was, although it was agreed such a determination could have been made by optical rodatory dispersion measurement.

The expert witness for the state testified he had performed various analytical tests at the crime laboratory on the substance purchased and given him by Hughes for the purpose of identifying it, which he enumerated as the spot test [2] or field test for LSD, ultraviolet fluores-

_____

[2] The spot test or field test for LSD is a general classification or elimination test, yielding only negative or positive results. Negative results reveal the absence of certain compounds but positive results only indicate that the sample may contain a suspected compound. A very small portion of the sample is transferred to small depressions on a white porcelain plate. To each depression containing the sample, two reagents are added: P-Dimethylaminobenzaldehyde (p-DMAB) and hydrochloric acid. If the test is negative, there will be no color change. If positive, a purple or blue color will manifest itself, indicating the presence of either or both of two large classes of compounds: indoles and pyrroles. LSD, DMT, DET, tryptophon (an amino acid found in meat and human tissue) ergotamine (prescription pharmaceutical for migraine headaches), ergonovine and methylergonovine (prescription pharmaceuticals used primarily by gynecologists), and the entire series of clavine alkaloids are some examples of indole compounds which produce positive results. *See* Stein, Laessig, and Indriksons, *An Evaluation of Drug Testing Procedures Used by Forensic Laboratories and the Qualifications of Their Analysts* [hereinafter *Drug Testing Procedures*], 1973 Wisconsin Law Review 727, 741–743. *See also:* Bailey and Rothblatt, *Handling Narcotic and Drug Cases* (1972), p. 231, sec. 283. In the instant case, the state's expert witness observed the formation of a blue-violet color upon addition of the reagents.

cent spectrophotometry,[3] thin-layer chromatography [4] and infrared spectrophotometry.[5] After making these

[3] In spectrophotometry, the analyst uses a spectrophotometer to project a series of wavelengths of light onto a sample, producing a spectrum or graph of the amount and wavelength of the light energies absorbed by the sample molecules, which in turn indicates the presence of a particular type of chemical bond. Ultraviolet spectrophotometry measures absorption of ultraviolet light by chemical bonds. Ultraviolet fluorescent spectrophotometric analysis measures the wavelength absorbed and subsequently emitted. *See Drug Testing Procedures, supra,* p. 753–759; Bailey and Rothblatt, *Handling Narcotic and Drug Cases,* p. 231, 233, sec. 287. In the instant case, the state's expert witness reported that the test revealed the presence of indole compounds.

[4] Thin-layer chromatography is adsorption chromatography. In TLC, a thin film of an inert material, usually silica gel, is affixed to a glass or plastic plate about 20 cm. long. One to 25 mg. of the sample to be chromatographed is dissolved in a volatile solvent and a fraction of a drop is placed about 1 cm. above the bottom of the plate. The volatile solvent evaporates leaving the material to be chromatographed as a residue. A known sample of LSD is spotted alongside the unknown when the test is run to identify the unknown. The plate is then placed vertically in a closed chamber with its lower edge immersed about 0.25 cm. in a selected solvent. When the mobile phase ascends to the point where the material was spotted, the compound or compounds, in the sample, separate between the adsorbent and the mobile phase depending on their solubility in the solvent. Since different compounds have different relative affinities for the adsorbent, the mobile phase causes some compounds to be carried farther up the plate than others. The compound is identified by spraying the plate with a specific reagent causing a spot to be highlighted and then comparing the migration distance ($R_f$ value) the unknown traveled to that traveled by the known. *See: Drug Testing Procedures, supra,* 1973 Wisconsin Law Review 727, pp. 747, 751; Bailey and Rothblatt, *Handling Narcotics and Drug Cases, supra,* pp. 232, 233, sec. 286. TLC is an exclusionary test rather than a test of positive and specific identification. In the instant case, the state's expert witness reported that the $R_f$ values for the sample and known LSD were calculated by observation under ultraviolet light and were the same.

tests he concluded to a reasonable degree of scientific certainty that the substance which Hughes had purchased from Berg was lysergic acid diethylamide (LSD). He further testified that commercially prepared and dispensed drug prescriptions ordinarily did not come in powder form wrapped in tinfoil as was the substance here.

The expert witness for the defendant similarly acknowledged he had never seen powdered drugs commercially packaged in tinfoil. He testified in substantial agreement that the spot test, in and of itself, was not specific for the presence of LSD and neither ultraviolet fluorescent spectrophotometry nor thin-layer chromatography furnished a specific test for LSD. While the state's expert asserted that when the three tests are performed in a series, one can specifically identify LSD, the defense expert disputed this. Both witnesses agreed that infrared spectrophotometry was specific in and of itself for LSD.

As a result of this testimony, there is no doubt that the state proved the substance sold by Berg was LSD, but it did not prove the substance was an isomer which had a hallucinogenic nature. Thus the issue is raised whether the state had a duty to prove the LSD sold was in fact dangerous.

Berg argues that because sec. 161.30 (1) (a) 3, Stats. 1969, defining LSD, does not list isomers of LSD in its compilation of dangerous drugs, whereas sec. 161.14 (4), Stats. 1971, does, it must be concluded that the legislature meant that sec. 161.30 (1) (a) 3, Stats. 1969, included

---

[5] This form of spectroscopy measures chemical bond absorption of infrared light. Since there is an almost infinite array of possible infrared absorption spectra, chemically similar compounds can be distinguished quite readily. Identification is made by superimposing the spectrum of an unknown sample over the spectrum of a known sample. *See: Drug Testing Procedures, supra,* 1973 Wisconsin L. Rev. 727, pp. 756, 781; Bailey and Rothblatt, *Handling Narcotic and Drug Cases, supra,* at p. 234, sec. 287.

only d-LSD because of the reference to dangerous drug in sec. 161.30, Stats. 1969. The trial court stated the 1971 version of the section was merely of a housekeeping nature and did not indicate a lack of intent to include isomers in the 1969 statutes. In his brief, Berg points out that the trial court is in error in its reasoning; but even though this may be so, Berg's argument has no merit, *i.e.*, in the laws of 1971 the legislature was dealing with drugs it wanted to control; the 1969 statute dealt only with dangerous drugs in fact. However, the legislature has the power to define in its judgment what drugs it considers dangerous and thus place controls on them. Ch. 161 of the statutes of 1971 proscribes the sale of "controlled substances" including "lysergic acid diethylamide" and its "salts, isomers and salts of isomers, unless specifically excepted, whenever the existence of these salts, isomers and salts of isomers is possible within the specific chemical designation." *See* secs. 161.14 (4) (j) and 161.41 (1) (b).[6] This statutory change was not "tidying up the bill" but was brought about as a consequence of the enactment of the Uniform Controlled Substances Act by the Laws of 1971, ch. 219, sec. 16 (effective October 1, 1972), which was to supplement and

Sec. 161.14 (4) lists certain of the substances included within Schedule I:

"Any material, compound, mixture or preparation which contains any quantity of the following hallucinogenic substances, their salts, isomers, and salts of isomers, unless specifically excepted, whenever the existence of these salts, isomers, and salts of isomers is possible within the specific chemical designation:

"(j) Lysergic acid diethylamide."

[6] Sec. 161.41 defines certain prohibited acts and establishes penalties. Sec. 161.41 (1) (b) prescribes that:

"Except as authorized by this chapter, it is unlawful for any person to manufacture or deliver a controlled substance. Any person who violates this subsection with respect to:

". . .

"(b) Any other controlled substance classified in schedule I, II or III [other than narcotic drugs] may be fined not more than $15,000 or imprisoned not more than 5 years or both."

mesh with the new Federal Comprehensive Drug Abuse Prevention and Control Act of 1970. An analysis of the bill which accomplished this change, prepared by the legislative reference bureau, gives some indication of the intent of the legislature.[7] Another indication of legislative intent is afforded by the prefatory note appended to the final draft of the Uniform Controlled Dangerous Substances Act when approved by the National Conference of Commissioners on Uniform State Laws in 1970.[8] Analysis of the federal controlled substances law, which was the stimulus for the Uniform Controlled Substances Act for states and the Wisconsin law, reveals it is virtual-

[7] "This bill enacts the uniform controlled substances act into Wisconsin law. Prepared by the National Conference of Commissioners on Uniform State Laws, the uniform act provides state legislation to complement the federal controlled substances act (P. L. 91–513) which was enacted in 1970. The bill replaces the existing uniform narcotics act and dangerous drug law [St. 1969, Chapter 161, as affected by Laws 1971, chs. 40, 42, 71 and 164] with an entirely new code (new chapter 161) of regulatory and administrative procedures which mesh with like federal procedures." *See* jacket on Laws of 1971, ch. 219, sec. 16 on file at the legislative reference library.

[8] "The Uniform Controlled Substances Act is designed to supplant the Uniform Narcotic Drug Act, adopted by the National Conference of Commissioners on Uniform State Laws in 1933, and the Model State Drug Abuse Control Act, relating to depressant, stimulant, and hallucinogenic drugs, promulgated in 1966. With the enactment of the new Federal narcotic and dangerous drug law, the 'Comprehensive Drug Abuse Prevention and Control Act of 1970' (Public Law 91–513, short title 'Controlled Substances Act'), it is necessary that the States update and revise their narcotic, marihuana, and dangerous drug laws.

"This Uniform Act was drafted to achieve uniformity between the laws of the several states and those of the Federal government. It has been designed to complement the new Federal narcotic and dangerous drug legislation and provide an interlocking trellis of Federal and State law to enable government at all levels to control more effectively the drug abuse problem." *See* Handbook of the National Conference of Commissioners on Uniform State Laws (1970), pp. 223, 224.

ly identical to the uniform act. *See* Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 USC 801, *et seq.*, 84 Stat. 1242; *see also* 21 CFR 301.01 to 301.76; 36 FR 7778. More particularly, the definition of controlled substances contained therein uses language identical to the uniform act in including LSD within its prohibition. The predecessor of this statute, 21 USC sec. 321 (v) (3), as amended by Public Law No. 90–639 (October 24, 1968), just as the predecessor of present sec. 161.14 (4) (j), proscribed LSD using the simple term "lysergic acid diethylamide." There is no indication in the legislative history of the enactment of the Comprehensive Drug Abuse Prevention and Control Act of 1970, that Congress considered the simple phrase "lysergic acid diethylamide," inadequate or less inclusive. *See* 1970 U. S. Code Cong. and Adm. News, p. 4566. Consequently, it does not appear that the more specific enumeration of our sec. 161.14 (4) (j) resulted from dissatisfaction with sec. 161.30 (1) (a) 3, Stats. 1969.

Berg also argues that the legislature in enacting sec. 161.30 (1) (a) 3, Stats. 1969, used the form " 'LSD' (lysergic acid diethylamide)" advisedly and intended thereby to classify only d-LSD as a dangerous drug. But again the legislative history does not support this argument. Nor is there anything in sec. 161.30 (1) (a) 3, Stats. 1969, which indicates the legislature intended to limit the meaning of LSD to d-lysergic acid diethylamide. The legislature apparently considered all forms of LSD to be a dangerous drug. From the standpoint of chemistry, it may be that the legislature was in error; but if that is what the legislature meant, then the statute must be construed as embracing all isomeric forms of LSD.

We do not find the case of *United States v. Farber* (N. D. C. Cal. 1969), 306 Fed. Supp. 48, to be helpful. The holding of another state or jurisdiction is generally helpful in deciding the meaning of a statute when the Wisconsin statute is taken from that state's jurisdiction

after the decision or the statutes have a common source. In *Farber,* the defendants were indicted for conspiracy to sell d-lysergic acid diethylamide in violation of 21 USC secs. 331 (q) (2), 360a (b), and 321 (v) (3). At trial, the proof showed the defendants intended to sell d-lysergic acid diethylamide in the salt form. Defendants moved for acquittal on the ground the evidence was insufficient, contending this statute forbade only the sale of lysergic acid diethylamide in the free-base form. The court concluded the legislative history expressed an intent to include lysergic acid diethylamide in both free base and salt form and sustained the convictions. In reaching its conclusion, the court stated that the phrase "lysergic acid diethylamide," as used in the statute, referred to d-lysergic acid diethylamide and the term "LSD" should be understood to mean "any form of a drug which chemically contains the substance lysergic acid diethylamide and which has the hallucinogenic potential of that substance." Considering the specific charge in *Farber* was selling d-lysergic acid diethylamide, this dicta is not to be taken to exclude other isomers. It is a common error in analyzing opinions to assume that the converse of a statement is necessarily true or intended or because X is included in Z that Y is necessarily excluded. In *Farber,* the question presented on this appeal was expressly reserved, namely, whether the words "lysergic acid diethylamide" included the levo and iso forms of LSD as well as the dextro form.

Finally Berg argues sec. 161.30 (1) (a) 3, Stats. 1969, should be understood to refer solely to d-lysergic acid diethylamide because it is generally understood that LSD refers to a hallucinogenic drug and d-LSD is the only hallucinogenic isomer of LSD. There may be some basis for drug experts to so construe LSD. *See* Stein, Laessig and Indriksons, *An Evaluation of Drug Testing Procedures Used by Forensic Laboratories and the Qualifications of Their Analysts,* 1973 Wis. L. Rev. 727, 776, 778;

Bailey and Rothblatt, *Handling Narcotic and Drug Cases* (1972), pp. 268, 272, sec. 330. But we find no evidence in the record or otherwise that lay people or the legislature so understand the term "LSD." Berg also relies on two principles of statutory construction, *i.e.*, the doctrines of *ejusdem generis* and of *expressio unius est exclusio alterius*. The doctrine of *ejusdem generis* is not applicable since this court is called upon to construe a specific word, LSD, whereas the doctrine of *ejusdem generis* is invoked to construe a general word which follows a series of specific words. LSD does not follow any specific words in the statute. *See* 2 Sutherland, *Statutory Construction* (3d ed.), p. 395, sec. 4909; *National Amusement Co. v. Department of Revenue* (1969), 41 Wis. 2d 261, 272, note 3, 163 N. W. 2d 625. If we were to apply the doctrine of *expressio unius est exclusio alterius* to the series of substances stated in sec. 161.30 (1) (a) 3, Stats. 1969, "any salts, derivatives, compounds, combinations or mixtures thereof and any substances that are chemically identical with such substances," it would eliminate all isomers of lysergic acid diethylamide. Berg argues isomers are independent chemical entities, different from the substances listed and consequently must be considered excluded. This may be true but the application of this rule of construction would not eliminate the nonhallucinogenic isomers from the preceding general term "LSD" because the specific terms following LSD do not purport to limit LSD or the other general words but to be an enlargement.

The trial court was correct in deciding that lysergic acid diethylamide in all its isomeric forms was included in the term " 'LSD' (lysergic acid diethylamide)" in sec. 161.30 (1) (a) 3, Stats. 1969, and consequently, the state was not required to prove that the substance Berg sold was the specific isomer d-LSD with hallucinogenic attributes.

*By the Court.*—Judgment of conviction and order denying a new trial are affirmed.